United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| ERIC OTTOLINI, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF ROHNERT PARK, et al.,<br><br>    Defendants. | Case No. 19-cv-02851-LB<br><br>**ORDER REVIEWING COMPLAINT UNDER 28 U.S.C. § 1915 AND DISMISSING COMPLAINT IN PART WITHOUT PREJUDICE**<br><br>Re: ECF No. 1 |

**INTRODUCTION**

Pro se plaintiffs Eric Ottolini and Jaymi Lucia bring this action against the City of Rohnert Park, the Rohnert Park Police Department ("RPPD"), and Doe officers 1–10. Ms. Lucia, and Mr. Ottolini's and Ms. Lucia's daughter, live in Rohnert Park.[1] Mr. Ottolini and Ms. Lucia have been in an ongoing conflict with the occupants of a neighboring unit, Dana McCoy and Stephanie White. On May 22, 2017, Mr. Ottolini decided to confront Mr. McCoy and set up his cell phone in advance to record the confrontation. On May 23, Mr. Ottolini set up his cell phone again to record his interactions with Mr. McCoy. Mr. Ottolini and Mr. McCoy got into a fight, where Mr. McCoy "assault[ed]" Mr. Ottolini, and Mr. Ottolini drew a pistol in response.

---

[1] Mr. Ottolini does not live with them.

ORDER – No. 19-cv-02851-LB

Following the fight, Mr. Ottolini asked neighbors to call 911. When the Rohnert Park police arrived, Mr. Ottolini approached them, holding his cell phone in his hand up in the air so that it could not be mistaken for a weapon. The police ordered Mr. Ottolini to get on the ground, and Mr. Ottolini complied. The police then ordered Mr. Ottolini to get up. Mr. Ottolini did so, leaving his cell phone on the ground, rather than picking it up and risking the police mistaking it for a weapon and possibly shooting him in response. The police then arrested Mr. Ottolini. Mr. Ottolini told the police that he had filmed his confrontations with Mr. McCoy on his cell phone and asked the police to retrieve the phone from the driveway. The police apparently did not do so, and the phone and Mr. Ottolini's video recordings were lost. Mr. Ottolini also asked the police to grab his car key and said that it was on the porch. The police apparently did not find the key on the porch and climbed through a window into Ms. Lucia's home.

Mr. Ottolini was charged with violations of California Penal Code § 245(b) (assault with a firearm) and California Penal Code § 422(a) (criminal threats). Mr. Ottolini's bail was set at $200,000. Mr. Ottolini made arrangements with his father to bail him out and paid $20,000, or 10% of the bail amount, out of pocket. The criminal charges against Mr. Ottolini were ultimately dismissed.

Mr. Ottolini and Ms. Lucia bring claims (1) against the RPPD and the Doe officers under the Fourteenth Amendment for the police's failure to retrieve Mr. Ottolini's cell phone and the video-recording evidence on it, (2) against the RPPD and the Doe officers under the Fourth Amendment for the police's entering Ms. Lucia's locked home through a window without a warrant or probable cause, (3) against the RPPD and the Doe officers for "spoliation of evidence" for the police's failure to retrieve his cell phone, and (4) against the City of Rohnert Park for negligence for failing to take steps to correct the alleged abuses of its police force. The plaintiffs seek to recover the $20,000 Mr. Ottolini paid out of pocket to make bail, plus unspecified general, special, compensatory, and punitive damages.

Because the plaintiffs are proceeding in forma pauperis, the court screens their complaint pursuant to 28 U.S.C. § 1915. The plaintiffs may be able to plead a cognizable Fourth Amendment

1    claim against the Doe officers who entered Ms. Lucia's home. The plaintiffs' other claims are not

2    cognizable as pleaded, and the court dismisses them, without prejudice and with leave to amend.

3    If the plaintiffs agree that they voluntarily do not want to proceed on their other claims, they

4    may file an amended complaint that alleges only their Fourth Amendment claim and removes their

5    other claims, in which case the court will order that the U.S. Marshal Service serve the complaint

6    and a summons on the Doe officers.[2] Alternatively, the plaintiffs may file an amended complaint

7    that repleads their other claims (or new claims) if they can cure the defects the court identifies in

8    this order.

9    If the plaintiffs file an amended complaint, the court will screen it again pursuant to 28 U.S.C.

10   § 1915. If the plaintiffs do not file an amended complaint, the court will reassign this case to a

11   district judge, and the undersigned will issue a report and recommendation that the plaintiffs' non-

12   Fourth-Amendment claims be dismissed and that they be allowed to proceed on their Fourth

13   Amendment claim.

## STATEMENT[3]

On May 22 and 23, 2017, Eric Ottolini visited Jaymi Lucia and their daughter overnight at Ms. Lucia's home.[4]

There are three residential units on the property: Units A, B, and C.[5] The main house is a duplex, with Unit A on the ground floor and Unit B on the second story, accessible by an exterior

---

[2] There is no obligation that the plaintiffs remove any claims from their complaint; the court presents it solely as an option. Voluntarily removing claims may waive the right to later pursue those claims or to appeal the dismissal of those claims.

[3] Unless otherwise stated, the facts in the Statement are allegations from the complaint and are presumed to be true for the purposes of this order.

[4] Compl. – ECF No. 1 at 4 (¶ 6), 12 (¶42). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[5] *Id.* at 5 (¶ 7).

staircase.[6] Unit C — Ms. Lucia's home — is a studio or "granny unit," adjacent to the main building, with a separate entrance and a porch.[7]

Unit B is occupied by Dana McCoy and his girlfriend Stephanie White.[8] The plaintiffs allege that Unit B actually is leased under "HUD [the U.S. Department of Housing and Urban Development]/Section 8" to a Devon Schroeder and her daughter but that neither Ms. Schroeder nor her daughter live there and that Unit B instead is occupied by Mr. McCoy and Ms. White.[9]

### 1. May 22, 2017

During Mr. Ottolini's visit, he and Ms. Lucia discussed how Mr. McCoy allegedly was engaging in criminal activities that terrified Ms. Lucia's children.[10] Mr. McCoy had been reported to the Rohnert Park Police Department in November 2016, but the RPPD allegedly ignored the report.[11] Mr. Ottolini decided to confront Mr. McCoy and tell him that if he did not vacate the property in two weeks, Mr. Ottolini would report to HUD authorities how Mr. McCoy and Ms. White were living in Unit B when Ms. Schroeder was the actual the recipient of the housing certificate for Unit B.[12]

On the evening of May 22, 2017, Mr. Ottolini set up his cell phone to take a video, placing it in his front pocket with the lens facing outward, and went upstairs to the door of Unit B.[13] After knocking several times, announcing himself, and calling out to the occupants, he received no

---

[6] *Id.* (¶¶ 7–8).

[7] *Id.* (¶ 9), 18 (¶75).

[8] *Id.* at 5 (¶ 8).

[9] *Id.*

[10] *Id.* at 6 (¶ 13). The plaintiffs allege that Mr. McCoy committed "theft of gas and parts from Jaymi's vehicle, vandalism to Eric and Jaymi's vehicles, HUD fraud, domestic violence, physical threats, peeping and harassment with a DJI Phantom drone, [and] methamphetamine sales," *id.*, and that he "has a criminal record upwards in the amount of 10 to 15 cases in Sonoma County," *id.* at 15 (¶ 59).

[11] *Id.* at 6 (¶ 13).

[12] *Id.* (¶ 14).

[13] *Id.* (¶ 15–16).

ORDER – No. 19-cv-02851-LB           4

response and returned to Unit C (Ms. Lucia's home).[14] About ten minutes later, Mr. Ottolini heard shouting and banging coming from Unit B.[15] He set up his phone as before and went to the base of the exterior stairs, where he saw Ms. White kicking the door of Unit B.[16] He asked her to go and get Mr. McCoy, and they argued for several minutes, after which Ms. White left the property.[17]

Mr. Ottolini returned to Unit C to tell Ms. Lucia what had happened.[18] After about ten minutes, Mr. Ottolini went back outside to check on their vehicles to make sure that Mr. McCoy or Ms. White were not vandalizing or tampering with them.[19] When Mr. Ottolini went out to check on the vehicles, he noticed a RPPD police cruiser parked across the street.[20] He crossed the street and spoke with two officers, whom the complaint identifies as "Officer A" and "Officer B."[21] (The complaint does not provide a description for Officer A but describes Officer B as "a bald, tall, white male."[22]) Mr. Ottolini provided his ID to the officers at their request.[23] One officer asked Mr. Ottolini for further information about the events that took place that evening, while the other officer said he would go to the property and get further information.[24] Mr. Ottolini said that Mr. McCoy should still be in Unit B but that he was not likely to answer because he was a drug-dealing felon.[25] One of the officers asked who else was on the property, and Mr. Ottolini responded that his daughter and his "baby's momma" were in Unit C.[26] One of the officers went to

---

[14] *Id.* at 6–7 (¶¶ 16–19).
[15] *Id.* at 7 (¶ 19).
[16] *Id.* (¶ 20).
[17] *Id.* at 7–8 (¶¶ 21–22).
[18] *Id.* at 8 (¶ 23).
[19] *Id.*
[20] *Id.* (¶ 24).
[21] *Id.* (¶ 26).
[22] *Id.*
[23] *Id.* at 9 (¶ 27).
[24] *Id.*
[25] *Id.* (¶ 28).
[26] *Id.* (¶ 29).

Unit B and then returned and confirmed that no one had answered the door.[27] The officer asked Mr. Ottolini, "did you do that to the front door?" (presumably referring to damage to the door of Unit B) and Mr. Ottolini responded, "Nope! That was his [Mr. McCoy's] girlfriend."[28]

The officers conferred with each other briefly and then told Mr. Ottolini that he should leave the property.[29] Mr. Ottolini said he was not going to leave his daughter or her mother (Ms. Lucia) alone after the night's events, particularly given that Ms. Lucia was suffering from medical problems.[30] The officers told Mr. Ottolini that he had no right to be at the property because it was not his home and he was not on the lease.[31] Mr. Ottolini said that he "would have to agree to disagree" and that unless the officers were ordering him to leave "under the law," he was not going to leave.[32] The officers responded that "that wasn't a wise decision."[33]

Mr. Ottolini returned to Unit C (Ms. Lucia's home).[34] Ms. Lucia told him that the officer who had come to the property had threatened: "You know a Judge can take your kids away for living next to a drug dealer."[35] Mr. Ottolini called the RPPD to lodge a complaint about this and left a voicemail with the watch commander.[36] He never received a response.[37] Ms. Lucia then texted Ms. Schroeder (the actual lessee of Unit B) to inform her of the night's events and to let Ms. Schroeder know that Mr. Ottolini would be contacting HUD to let HUD know that Mr. McCoy and Ms. White were fraudulently living at, and dealing drugs out of, a HUD property.[38] Ms. Schroeder

---

[27] *Id.* (¶ 30).
[28] *Id.*
[29] *Id.* (¶ 31).
[30] *Id.*
[31] *Id.* at 10 (¶ 32).
[32] *Id.*
[33] *Id.* (¶ 33).
[34] *Id.* (¶ 34).
[35] *Id.* (¶ 35).
[36] *Id.* at 10–11 (¶¶ 36–37).
[37] *Id.* at 11 (¶ 38).
[38] *Id.* (¶ 39).

immediately responded that she was kicking out Mr. McCoy and Ms. White effective immediately and that they would be gone by the morning.[39]

### 2. May 23, 2017 — Pre-RPPD Arrival

The next morning, Mr. McCoy was absent from the property.[40] Mr. McCoy returned that afternoon at approximately 4 p.m., however.[41] Mr. Ottolini went out to investigate, and Mr. McCoy saw him and shouted at him, "You out here like some fucking dog! You fucking tweeker."[42] Mr. McCoy walked up the driveway, where Mr. Ottolini lost sight of him.[43] Mr. Ottolini returned to Ms. Lucia, and the two of them discussed what to do next.[44] Mr. Ottolini heard Mr. McCoy's car start up again but then heard the engine sputter out as if it were out of gas.[45] Ms. Lucia was upset that Mr. McCoy was not leaving and said to Mr. Ottolini that she and their daughter needed to get out of the area.[46] Ms. Lucia collected her purse and keys.[47] Mr. Ottolini grabbed his car key and also a lawfully possessed .380 pistol, which he placed in his waistband.[48] Mr. Ottolini started the video recorder on his cell phone and placed his phone in his pocket with the lens exposed, and then proceeded to escort Ms. Lucia and their daughter to Ms. Lucia's car.[49]

When Mr. Ottolini and Ms. Lucia reached the car, they saw Ms. White sitting on one of the steps outside and Mr. McCoy at the top landing near the entrance to Unit B.[50] Mr. McCoy came

---

[39] *Id.* (¶ 40).
[40] *Id.* at 12 (¶ 42).
[41] *Id.* (¶¶ 43–45).
[42] *Id.* (¶ 46).
[43] *Id.* at 13 (¶ 47).
[44] *Id.* (¶¶ 48–50).
[45] *Id.* (¶¶ 50–51).
[46] *Id.* at 14 (¶ 52).
[47] *Id.* (¶ 53).
[48] *Id.*
[49] *Id.*
[50] *Id.* (¶ 55).

down the stairs, walked in front of Ms. Lucia's car, mumbled something inaudible to Mr. Ottolini, and then pointed both hands at Mr. Ottolini "as if they were imaginary revolvers" and mimed shooting.[51] Mr. McCoy winked at Mr. Ottolini and continued down the driveway to his own vehicle, where Mr. Ottolini lost sight of him.[52]

Ms. Lucia and her daughter got in their car and began to drive away.[53] Ms. Lucia then stopped her car and said she was not leaving her dog behind.[54] As she went to get her dog, Mr. McCoy reappeared and began shouting obscenities.[55] Ms. Lucia retrieved her dog and got in her car and drove off the property.[56] Mr. Ottolini started walking back to Unit C (Ms. Lucia's home), when Mr. McCoy again started to shout obscenities.[57]

Mr. Ottolini responded with something to the effect of, "If you're such an advocate for women, then why'd you leave your girl alone, crying on the porch last night?"[58] Mr. McCoy "storm[ed]" toward Mr. Ottolini, "pumping his arms," and "assault[ed]" him.[59] Mr. Ottolini retreated, and Mr. McCoy pursued him.[60] Mr. Ottolini drew his pistol.[61] Mr. McCoy's "advances and aggressive behavior d[id] not cease, until [Mr. Ottolini] remove[d] his index finger from the slide of the firearm and place[d] it inside the trigger well."[62] Mr. Ottolini was then hit in the head

---

[51] *Id.* at 15 (¶ 57).
[52] *Id.* (¶¶ 57–58).
[53] *Id.* (¶ 60).
[54] *Id.* at 16 (¶ 62).
[55] *Id.*
[56] *Id.* (¶ 63).
[57] *Id.* (¶ 64).
[58] *Id.* (¶ 65).
[59] *Id.* at 16–17 (¶¶ 66–67).
[60] *Id.* at 17 (¶ 67).
[61] *Id.* (¶ 68).
[62] *Id.*

by a "projectile," later determined to be a cell phone, which Ms. White allegedly threw.[63] Mr. Ottolini retreated toward Unit C (Ms. Lucia's home).[64]

Once he was back on Ms. Lucia's porch, Mr. Ottolini took out his cell phone to confirm that it had video-recorded the incident.[65] He dialed 911, but the phone's battery ran out and it powered down.[66] He went to plug the phone back in, but he was unable to get into Unit C because the unit was locked and Ms. Lucia had taken the key.[67] He took out his car key and placed it on the porch, removed the magazine from his pistol and placed it on the porch, and walked toward a neighbor's house, intending to ask them to call 911.[68]

### 3. May 23, 2017 — Post-RPPD Arrival

Mr. Ottolini returned to a corridor and started walking toward a driveway.[69] Mr. Ottolini saw two to three RPPD officers, including Officer B, armed with AR-15 rifles.[70] He cautiously approached them and held his cell phone in the air in his left hand so that it would not be mistaken for a firearm.[71] Officer B noticed Mr. Ottolini, raised his rifle, and shouted for him to turn around and get on the ground.[72] Mr. Ottolini complied.[73] The RPPD then instructed him to get up again, keep his back facing the officers, and follow their commands.[74] Mr. Ottolini got up from the

---

[63] *Id.* (¶ 69).
[64] *Id.* (¶ 71).
[65] *Id.* at 18 (¶ 73).
[66] *Id.*
[67] *Id.* (¶ 74).
[68] *Id.* (¶¶ 75–76).
[69] *Id.* at 19 (¶¶ 77–78). It is not entirely clear from the complaint where this corridor and driveway were.
[70] *Id.* (¶ 78).
[71] *Id.* (¶ 79).
[72] *Id.* (¶ 80).
[73] *Id.*
[74] *Id.* (¶ 81).

ground.[75] He decided to leave his cell phone on the driveway where he had been lying so that he could keep his hands in clear view as he was getting up from the ground, rather than holding the phone and risking an officer mistaking it for a firearm and shooting him in response.[76] The RPPD took him into custody and put him in a squad car, where he was questioned by an officer whom the complaint identifies as "Officer C."[77]

Mr. Ottolini summarized the events and told Officer C that he had video recorded the events on his cell phone.[78] He asked Officer C to please grab his cell phone from the driveway.[79] Officer C acknowledged his request.[80]

Sometime later, Officer C moved Mr. Ottolini to a police SUV.[81] Mr. Ottolini reminded Officer C to grab his cell phone and also asked Officer C to grab his car key.[82] Officer C asked where the car key was, and Mr. Ottolini said it was on Ms. Lucia's porch.[83] Officer C shouted at an unknown officer to grab Mr. Ottolini's key.[84]

The unknown officer responded that Mr. Ottolini's key was in Ms. Lucia's home.[85] Mr. Ottolini asked Officer C how that was possible when the home was locked.[86] Officer C asked the unknown officer and subsequently relayed the response to Mr. Ottolini that the unknown officer had climbed in through the window.[87]

---

[75] *Id.* at 20 (¶ 82).
[76] *Id.*
[77] *Id.* (¶ 83).
[78] *Id.* (¶ 84).
[79] *Id.*
[80] *Id.*
[81] *Id.* at 21 (¶ 87).
[82] *Id.*
[83] *Id.*
[84] *Id.*
[85] *Id.* (¶ 88).
[86] *Id.*
[87] *Id.*

While Mr. Ottolini was in the SUV, he heard Officer B, Officer C, and an unknown officer talking.[88] One of the officers said that Mr. Ottolini had pulled a gun on Mr. McCoy.[89] Mr. Ottolini shouted through the SUV window that Mr. McCoy was lying and that "It's on my phone, just grab my phone."[90] Officer B shouted at Mr. Ottolini to "SHUT UP."[91] Officer C then told the other two officers, "He's [sic] says that he has video of the entire thing on his phone."[92] The three officers dispersed after that.[93]

Another officer, Sergeant Strongman, entered the driver's seat of the SUV and drove Mr. Ottolini to the Sonoma County Main Adult Detention Facility.[94] Mr. Ottolini was charged with violating California Penal Code § 245(b) (assault with a firearm) and California Penal Code § 422(a) (criminal threats).[95] Mr. Ottolini's bail was set at $100,000.[96]

### 4. Subsequent Events

Mr. Ottolini was held in the Sonoma County Main Adult Detention Facility from May 23 to May 26, 2017.[97]

The first morning (May 24), Mr. Ottolini filled out a medical-treatment-request form.[98] Mr. Ottolini suffers from pain and mobility problems in both shoulders and had been prescribed the medication Cymbalta, which he indicated when he was booked in jail.[99] (He also has a bulging

---

[88] *Id.* (¶ 89).
[89] *Id.*
[90] *Id.* (¶ 90).
[91] *Id.*
[92] *Id.* (¶ 91).
[93] *Id.*
[94] *Id.* at 22 (¶¶ 93–95).
[95] *Id.* (¶ 96).
[96] *Id.*
[97] *Id.* (¶ 96), 24 (¶ 106).
[98] *Id.* at 23 (¶ 97).
[99] *Id.* (¶ 98).

ORDER – No. 19-cv-02851-LB 11

disk in his neck, and suffers from fibromyalgia.[100]) Cymbalta also serves as an antidepressant, and Mr. Ottolini alleges that antidepressants should not be stopped immediately.[101] Mr. Ottolini was not provided Cymbalta while he was in jail.[102]

Mr. Ottolini made an appearance before a judge, where he was charged with additional felonies and his bail was increased to $200,000.[103]

After returning from his first appearance before the judge, Mr. Ottolini filled out another request for medical attention, stating that he was suffering from side effects that felt like "electrical shocks or pulses" that originated in his head and coursed through his body, causing distress and discomfort.[104] He was never treated or seen by any medical staff while in custody.[105]

On May 26, 2017, Mr. Ottolini made arrangements with his father and was bailed out of jail.[106] Mr. Ottolini paid ten percent of his bail fee, i.e., $20,000, out of pocket to make his $200,000 bail.[107]

Mr. Ottolini learned that the RPPD had not recovered his cell phone as evidence when he was arrested on May 23, 2017.[108] Mr. Ottolini made every effort to try to find his cell phone and the video recordings that were on it, which he maintained would exonerate him, but the cell phone was never recovered.[109]

On February 26, 2018, all criminal charges against Mr. Ottolini were finally dismissed.[110]

---

[100] *Id.*
[101] *Id.* (¶ 101).
[102] *Id.* (¶ 100).
[103] *Id.* (¶ 99).
[104] *Id.* at 24 (¶ 102).
[105] *Id.* (¶ 103).
[106] *Id.* (¶ 106).
[107] *Id.* at 30 (¶ 124).
[108] *Id.* at 24 (¶ 104).
[109] *Id.* at 25 (¶ 107).
[110] *Id.* (¶ 111).

## STANDARD OF REVIEW

A complaint filed by any person proceeding in forma pauperis under 28 U.S.C. § 1915(a) is subject to a mandatory and sua sponte review and dismissal by the court to the extent that it is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B); *Calhoun v. Stahl*, 254 F.3d 845, 845 (9th Cir. 2001); *Lopez v. Smith*, 203 F.3d 1122, 1126–27 (9th Cir. 2000) (en banc). Section 1915(e)(2) mandates that the court reviewing an in forma pauperis complaint make and rule on its own motion to dismiss before directing the United States Marshal to serve the complaint pursuant to Federal Rule of Civil Procedure 4(c)(3). *Lopez*, 203 F.3d at 1127. The Ninth Circuit has noted that "[t]he language of § 1915(e)(2)(B)(ii) parallels the language of Federal Rule of Civil Procedure 12(b)(6)." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998).

Under Rule 12(b)(6) and 28 U.S.C. § 1915(e)(2)(B), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. Rule 8(a)(2) requires that a complaint include a "short and plain statement" showing the plaintiff is entitled to relief. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The complaint need not contain "detailed factual allegations," but the plaintiff must "provide the grounds of his entitle[ment] to relief," which "requires more than labels and conclusions"; a mere "formulaic recitation of the elements of a cause of action" is insufficient. *Twombly*, 550 U.S. at 555.

In determining whether to dismiss a complaint under Rule 12(b)(6), the court is ordinarily limited to the face of the complaint. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). Factual allegations in the complaint must be taken as true and reasonable inferences drawn from them must be construed in favor of the plaintiff. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996). The court cannot assume, however, that "the [plaintiff] can prove facts that [he or she] has not alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). "Nor is the court required to accept as true

allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

If a court dismisses a complaint, it should give leave to amend unless the "pleading could not possibly be cured by the allegation of other facts." *United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1182 (9th Cir. 2016) (citations and internal quotation marks omitted). But "leave to amend may be denied when a plaintiff has demonstrated a 'repeated failure to cure deficiencies by amendments previously allowed.'" *Id.* at 1183 (quoting *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

## ANALYSIS

### 1. Fourteenth Amendment

The plaintiffs assert a claim under the Fourteenth Amendment for the RPPD's failure to secure Mr. Ottolini's cell phone from where he left it on the street. The plaintiffs allege that the video recordings on the phone would have corroborated Mr. Ottolini's claims of self-defense and that the RPPD's failure to secure the phone, and the resulting loss of the videos, led to Mr. Ottolini's "unjust prosecution." The plaintiffs have not pleaded a cognizable Fourteenth Amendment claim.

"'A police officer's failure to preserve or collect potential exculpatory evidence does not violate the Due Process Clause [of the Fourteenth Amendment] unless the officer acted in bad faith.'" *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (quoting *Cunningham v. City of Wenatchee*, 345 F.3d 802, 812 (9th Cir. 2003)). "'[M]ere lack of due care by a state official' does not 'deprive an individual of life, liberty, or property under the Fourteenth Amendment.'" *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc) (some internal quotation marks omitted) (quoting *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)). The plaintiffs do not allege that the RPPD or any officer acted in bad faith in failing to

secure Mr. Ottolini's cell phone. The court therefore dismisses the plaintiffs' Fourteenth Amendment claim.[111]

### 2. Fourth Amendment

The plaintiffs allege a claim under the Fourth Amendment for the RPPD's warrantless entry into Ms. Lucia's home. Claims against state actors like the RPPD and its officers for violations of constitutional rights are actionable through 42 U.S.C. § 1983. The plaintiffs allege that RPPD officers climbed in through the window to enter Ms. Lucia's home without a warrant or probable cause. The plaintiffs may be able to plead a cognizable Fourth Amendment claim against the individual Doe officer or officers who entered Ms. Lucia's home. By contrast, the plaintiffs have not pleaded a cognizable Fourth Amendment claim against the RPPD.

#### 2.1 Individual Officers

"The Fourth Amendment prohibits unreasonable searches and seizures." *Espinosa v. City and Cty. of San Francisco*, 598 F.3d 528, 533 (9th Cir. 2010). "For the Fourth Amendment to apply, one must have a reasonable expectation of privacy in the place that is invaded." *Id.* (citing *Minnesota v. Carter*, 525 U.S. 83, 88 (1998)). "An overnight guest in a home staying with the permission of the host has a reasonable expectation of privacy under the Fourth Amendment." *Id.* (citing *Minnesota v. Olson*, 495 U.S. 91, 98–100 (1990); *United States v. Armenta*, 69 F.3d 304, 308–09 (9th Cir. 1995)). "A warrantless entry into a home violates the Fourth Amendment unless an exception to the Fourth Amendment warrant requirement applies, such as emergency, exigency, or consent." *Id.* (citing *Lopez-Rodriguez v. Mukasey*, 536 F.3d 1012, 1016 (9th Cir. 2008)).

Ms. Lucia had a reasonable expectation of privacy in her home. As an overnight guest, Mr. Ottolini may have had a reasonable expectation of privacy as well. An RPPD officer or officers

---

[111] To the extent that the plaintiffs are bringing a claim for the loss of the cell phone as property (as opposed to the loss of the phone as evidence), their claim would still fail. "Neither the negligent nor intentional deprivation of property states a due process claim under § 1983 if the deprivation was random and unauthorized." *Body v. Phillips*, No. C 12-2871 PJH (PR), 2012 WL 3027542, at *1 (N.D. Cal. July 24, 2012) (citing *Parratt v. Taylor*, 451 U.S. 527, 535–44 (1981), *overruled in part on other grounds by Daniels v. Williams*, 474 U.S. 327, 330–31 (1986); *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)).

entered Ms. Lucia's home without a warrant and apparently without an emergency, exigency, or consent. The plaintiffs thus may be able to plead a claim against those officers. *Cf. id.* (allowing Section 1983 claim for warrantless entry of home).

### 2.2 Government Entities

To plead a constitutional claim against a government entity like the City of Rohnert Park or the RPPD (as opposed to an individual, such as an individual police officer), a plaintiff must plead that the government entity maintained a policy or custom that resulted in that constitutional violation. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978). Liability against a government entity starts from the premise that there is no respondeat superior liability under 42 U.S.C. § 1983, i.e., no entity is liable simply because it employs a person who has violated a plaintiff's rights. *See, e.g.*, *Monell*, 436 U.S. at 691; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). To plead a claim against a government entity, a plaintiff must show that (1) he possessed a constitutional right and was deprived of that right, (2) the government entity had a policy, (3) the policy amounts to deliberate indifference to his constitutional rights, and (4) the policy was the moving force behind the constitutional violation. *Plumeau v. Sch. Dist. # 40 Cty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). The Ninth Circuit has explained how a policy may be established:

> There are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate."

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (quoting *Ulrich v. City and Cty. of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)).

The plaintiffs have not cognizably pleaded a claim against RPPD, as they have not cognizably alleged that the RPPD had a policy or custom that amounted to deliberate indifference to their constitutional rights, much less that the RPPD's policy was the moving force behind any violation of their rights. *Cf. Clapp v. City and Cty. of San Francisco*, No. 18-cv-07269-LB, 2019 WL 2410508, at *7 (N.D. Cal. June 7, 2019) (dismissing constitutional claims against government

entities for failure to allege a government policy that amounted to deliberate indifference or that was the moving force behind the underlying constitutional violation). The plaintiffs generally allege that the RPPD "has a demonstrable pattern of civil rights abuses and negligent behavior."[112] This allegation is conclusory and is insufficient to cognizably plead an actionable government policy. *Cf. Leon v. Hayward Building Dep't*, No. 17-cv-02720-LB, 2017 WL 3232486, at *3 (N.D. Cal. July 31, 2017) (dismissing claims against government entity where "[t]he complaint does not begin to allege the minimal facts that would be needed to support [government-entity liability]"). The court therefore dismisses the plaintiffs' Fourth Amendment claim against the RPPD.[113]

### 3. Spoliation of Evidence

The plaintiffs assert a claim for spoliation of evidence for the RPPD's failure to secure evidence relating to Mr. Ottolini's arrest. California law does not recognize a civil cause of action for spoliation of evidence. *Lueter v. State*, 94 Cal. App. 4th 1285, 1300–01 (2002) (dismissing claims against police for spoliation of evidence) (citing cases). The court therefore dismisses the plaintiffs' spoliation-of-evidence claim.

### 4. Negligence

#### 4.1 Government Claims Act

With some exceptions not relevant here, the California Government Claims Act ("GCA") requires a party seeking to recover money damages from a public entity or its employees to present a written claim for damages to the entity within six months after accrual of the claim before filing suit in court. Cal. Gov't Code §§ 911.2(a), 945.4; *see, e.g.*, *Cardenas v. Cty. of Alameda*, No. C 16-05205 WHA, 2017 WL 1650563, at *5 (N.D. Cal. May 2, 2017) (GCA presentment requirement applies to state-law claims for negligence). "'Where compliance with the

---

[112] Compl. – ECF No. 1 at 29 (¶ 121).

[113] The plaintiffs did not name the City of Rohnert Park as a defendant in their Fourth Amendment claim, but if they had, that claim would fail for the same reason, i.e., failure to allege a government policy.

1 [GCA] is required, the plaintiff must allege compliance or circumstances excusing compliance, or the complaint is subject to general [dismissal].'" *Heyward v. BART Police Dep't*, No. 3:15-cv-04503-LB, 2015 WL 9319485, at *4 (N.D. Cal. Dec. 23, 2015) (quoting *Mangold v. Cal. Publ. Utils. Comm'n*, 67 F.3d 1470, 1477 (9th Cir. 1995)). "Only after the public entity has acted upon or is deemed to have rejected the claim may the injured person bring a lawsuit alleging a cause of action in tort against the public entity or its employees." *Avila v. California*, 2015 WL 6003289, at *7 (E.D. Cal., 2015) (citing *Shirk v. Vista Unified Sch. Dist.*, 42 Cal. 4th 201, 209 (2007)).

The plaintiffs are bringing their negligence claim against the City of Rohnert Park. The plaintiffs did not allege that they presented a GCA claim to the City. The court therefore dismisses the plaintiffs' negligence claim. If they timely presented a GCA claim to the City, they can include that fact in an amended complaint, but if they did not timely present a GCA claim, their state-law claims (including their negligence claim) against the City are barred.

### 4.2 Underlying Claim

The plaintiffs are suing the City of Rohnert Park for its own negligence, claiming that the City failed to adequately supervise and correct "a demonstrated pattern of civil rights abuses and negligent behavior" of its police force. Under California law, "[d]irect liability of a governmental agency must be based on a statute that declares the governmental entity to be liable or creates a specific duty of care." *Castro v. City of Union City*, No. 14-cv-00272-MEJ, 2014 WL 4063006, at *11 (N.D. Cal. Aug. 14, 2014) (citing Cal. Gov't Code § 815; *de Villers v. Cty. of San Diego*, 156 Cal. App. 4th 238, 247 (2008)). "As a condition to recovery against a local government entity based on direct liability, an injured party must identify a specific statute declaring the entity to be liable or creating a duty of care by the entity toward the injured party." *Id.* (citing *Eastburn v. Reg'l Fire Prot. Auth.*, 31 Cal. 4th 1175, 1183 (2003)). "Plaintiff[s] ha[ve] not identified such a statute, and California courts of appeal have held that no statutory basis exists for a claim of direct liability based on a public entity's negligent hiring, policymaking, and supervision." *Cf. id.* (citing *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1113 (2004), *overruled in part on other grounds by Hayes v. Cty. Of San Diego*, 57 Cal. 4th 622 (2013); *de Villers*, 156 Cal. App. 4th at

252–53). Even if the plaintiffs had timely presented a GCA claim, the court therefore would nonetheless dismiss on the merits the plaintiffs' negligence claim against the City of Rohnert Park.

## CONCLUSION

The court dismisses the plaintiffs' Fourteenth Amendment claims, their Fourth Amendment claims against the RPPD, their spoliation-of-evidence claims, and their negligence claims, without prejudice and with leave to amend. The court does not dismiss the plaintiffs' Fourth Amendment claim against the Doe defendants.

If the plaintiffs agree that they voluntarily do not want to proceed on their other claims, they may file an amended complaint that alleges only their Fourth Amendment claim and removes their other claims, in which case the court will order that the U.S. Marshal Service serve the complaint and a summons on the Doe defendants. Alternatively, the plaintiffs may file an amended complaint that repleads their other claims (or new claims) if they can cure the defects the court identifies in this order. The court extends the plaintiffs 21 days, or until August 9, 2019, to file an amended complaint. (The court notes for the plaintiffs' benefit that an amended complaint wholly supersedes, as opposed to merely supplementing, an earlier complaint, so if they file an amended complaint, they cannot rely on their original complaint, and their amended complaint must include all claims and factual allegations that they want to assert in this case.)

If the plaintiffs file an amended complaint, the court will screen it again pursuant to 28 U.S.C. § 1915. If the plaintiffs do not file an amended complaint, the court will reassign this case to a district judge, and the undersigned will issue a report and recommendation that the plaintiffs' non-Fourth-Amendment claims be dismissed and that they be allowed to proceed on their Fourth Amendment claim.

**IT IS SO ORDERED.**

Dated: July 19, 2019

_____
LAUREL BEELER
United States Magistrate Judge

ORDER – No. 19-cv-02851-LB       19